UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>v.<br><br>**JAMAL PAYNE,**<br><br>            **Defendant.** | **Crim. Action No.: 1:25CR147** |

## MEMORANDUM IN AID OF SENTENCING

Jamal Payne will appear before the Court on September 23, 2025, having accepted responsibility for unlawfully possessing a firearm through his plea to the Indictment charging him with one count of 18 U.S.C. § 922(g). As further explained in this Memorandum, Mr. Payne offers the following responses to the Pre-Sentence Report:

*First*, the Court should grant a downward departure under USSG § 5H1.4 because Mr. Payne suffers from Becker's Muscular Dystrophy (BMD) and resulting heart failure. According to two expert physicians who have reviewed his medical records, Mr. Payne's life expectancy is anywhere from one to five years, with a substantial probability of death within the next 12 months. If there was ever a case for a downward departure under 5H1.4, this would be it.

*Second*, Mr. Payne should be awarded a two-level reduction under USSG § 3E1.1(a) for his acceptance of responsibility—Mr. Payne pleaded to the Indictment well before the filing of motions and trial. His offense level should reflect his unequivocal acceptance of responsibility.

*Third*, a 6-level base offense level increase for Mr. Payne's possession of a firearm with a magazine that accepts 16 rounds overstates Mr. Payne's culpability where the firearm he possessed just meets the threshold of "more than 15 rounds" required to trigger the elevated base offense

level. *See* USSG 2K2.1 cmt 2 (defining "semiautomatic firearm that is capable of accepting a large capacity magazine" as a firearm that has a magazine that can accept "more than 15 rounds of ammunition."). Specifically, because Mr. Payne possessed a firearm equipped with a magazine that could hold 16 rounds—one round above the threshold—his base offense level increases from the standard 14 for a prohibited person to a base offense level of 20. This six level increase—*based on a single round*—nearly doubles Mr. Payne's guideline range. The Court should vary downward because the presence of a single round arbitrarily inflates Mr. Payne's guideline range and overstates his culpability.

Irrespective of the guideline range, the circumstances of this case including Mr. Payne's non-violent possessory offense, his terminal illness and debilitated physical state, and his acceptance of responsibility, call for a sentence of time-served followed by supervision with conditions including home incarceration.

### I.     Relevant Background

Mr. Payne has accepted responsibility for possessing a firearm that was recovered from his bag after he was rushed to the hospital with shortness of breath on January 8, 2025. The government informed the defense that the firearm Mr. Payne possessed was not immediately operable and had to be cleaned before the government test fired it. The firearm had a magazine capable of holding 16 rounds. There is no evidence that Mr. Payne removed the manufacturer's magazine to replace it with a larger magazine.

On February 19, 2025, the government charged Mr. Payne by complaint in D.C. Superior Court with Unlawful Possession of a Firearm for the gun that was recovered in a backpack at the hospital. He was placed on GPS monitoring and given release conditions in both the Superior Court case and a case in which he is under supervision by Judge Kelly, 21CR9. After initially charging Mr.

Payne in Superior Court with the January 8 firearm, the government elected to charge Mr. Payne in federal court. The government dismissed the Superior Court case and charged Mr. Payne by complaint with one count of 18 U.S.C. § 922(g) on May 13, 2025—four months after his arrest for unlawful possession of a firearm. At his Initial Appearance, the government requested detention, citing alleged violations of GPS monitoring. There was no allegation that Mr. Payne committed any new crimes or engaged in any violent conduct between his January gun possession and his appearance in District Court on May 13, 2025. As the Court is aware, Mr. Payne, through counsel, appealed the detention order, arguing in part that the D.C. Jail could not properly care for Mr. Payne. This Court held an evidentiary hearing after which the Court denied Mr. Payne's Motion for Release.

Having presided over the two-day evidentiary hearing on Mr. Payne's Motion for Release, the Court is aware of Mr. Payne's afflictions that render him a "seriously infirm defendant," specifically that Mr. Payne was born with Becker's Muscular Dystrophy (BMD), a degenerative disease that has significantly weakened Mr. Payne's heart and muscles, to the degree where he requires a device implanted in his heart to pump blood through his body and he is permanently confined to a wheelchair. U.S.S.G. §5H1.4. Medical professionals, including Mr. Payne's renowned cardiologist, predict that he is unlikely to survive much longer due to the advanced stage of his BMD.[1]

On June 23, 2025, Mr. Payne pleaded guilty to the one-count Indictment. All told, Mr. Payne was on strict conditions of release for approximately four months and detained for over four months in this case. He will be before the Court for sentencing on September 23, 2025. Counsel respectfully requests a sentence of time-served followed by home incarceration.

---

[1] Dr. Sheikh's testimony is attached hereto as exhibit 2.

## II. Responses to the Pre-Sentence Report

### i. The PSR should grant a 6-level downward departure under USSG § 5H1.4

Mr. Payne is 31 years old and was born with Becker Muscular Dystrophy (BMD), a genetic disease which killed four of his maternal uncles before they reached the age of 30. BMD is a progressive neuromuscular disorder leading to increasing skeletal and cardiac muscle weaknesses. Mr. Payne has end-stage systolic heart failure resulting from his BMD, which is the primary cause of death for someone with his condition. Mr. Payne's BMD causes him chronic, often excruciating pain, and he is prescribed high doses of pain medication to manage it. He is confined to a wheelchair and cannot get up without assistance, let alone walk or run. During Mr. Payne's pretrial incarceration there have been numerous beatings and stabbings, including a murder of a resident by other inmates. Mr. Payne himself has been threatened. Repeating an incident that has plagued his entire life, other inmates took advantage of his physical weakness and snatched his commissary right out of his hands. Mr. Payne is helpless to defend himself from attack, which is why he procured a small pocketknife at the jail and why he carried the firearm that led to his arrest.

Dr. Purim-Shem-Tov, the Executive Vice Chair of the Department of Emergency Medicine at Rush University Medical Center and board-certified ER Physician with 25 years of experience and a medical degree from the University of Chicago, reviewed Mr. Payne's medical records and the testimony presented at the hearing on Mr. Payne's Motion for Release. **Dr. Purim-Shem-Tov concluded that Mr. Payne's life expectancy is less than 24 months with a substantial probability of death within the next 12 months.**[2]

---

[2] Dr. Purim-Shem-Tov's letter has been provided to the Pre-Sentence Report writer and is attached hereto as Exhibit 1.

4

Dr. Farooq Sheikh, the medical director of MedStar Health's heart failure program, faculty at Johns Hopkins University, and nationally recognized expert in LVAD therapy, testified that Mr. Payne was his patient.[3] When Dr. Sheikh met Mr. Payne years ago, Mr. Payne was in heart failure due to his BMD. Dr. Sheikh explained that a left ventricular assist device (LVAD) is a device that is surgically implanted into a person's heart and pumps blood throughout the body when the heart is unable to generate enough blood flow on its own. Dr. Sheikh performed the surgery to implant the LVAD into Mr. Payne's heart eleven years ago and testified that LVAD patients should interface with trained clinicians in LVAD therapy every three months. This is especially important for Mr. Payne, because his LVAD device is no longer approved by the FDA due to its increased risk of stroke. Because Mr. Payne's LVAD device is no longer on the market, there is a heightened need for close monitoring by trained LVAD specialists. Dr. Sheikh further testified that Mr. Payne has developed leakiness of a heart valve, which has caused recurrent fluid retention. Dr. Sheikh characterized fluid retention as sign of a "recurrence of heart failure."[4] Based on Mr. Payne's laboratory testing, **Dr. Sheikh estimated that Mr. Payne's life expectancy is "somewhere between one to five years**."[5]

USSG § 5H1.4 allows for a downward departure based on physical condition and states in pertinent part:

> Physical condition or appearance, including physique, may be relevant in determining whether a departure is warranted, if the condition or appearance, individually or in combination with other offender characteristics, is present to an unusual degree and distinguishes the case from the typical cases covered by the guidelines. An extraordinary physical impairment may be a reason to depart downward; *e.g.*, in the case of a seriously infirm defendant, home detention may be as efficient as, and less costly than, imprisonment.

---

[3] Dr. Sheik's testimony at the hearing on Mr. Payne's Motion for Release is attached hereto at Exhibit 2.
[4] June 16, 2025, Hrg. Tr., pp. 43 (Dr. Sheikh's testimony attached hereto as Exhibit 2).
[5] *Id*. at 44.

USSG § 5H1.4.

If there is ever a case for a Section 5H1.4 departure, this is it. Two specially trained physicians, including Mr. Payne's renowned cardiologist, testified that Mr. Payne has a limited life expectancy—likely one year or less, but up to five years at best. He is unable to get out of his wheelchair and perform basic functions without assistance and is in constant pain. BMD is a degenerative disease, meaning Mr. Payne's symptoms will only get worse and have no chance of improving. Because the primary cause of death for those in his condition is heart failure, his death is likely to be sudden.

Mr. Payne is not before the Court convicted of a violent offense or an offense involving injury to any victim. He possessed a firearm for self-defense purposes and self-defense purposes only. The firearm, in the state it was recovered, was not capable of being fired, especially by Mr. Payne. Mr. Payne's mother, sister, and partner stand ready to assist him and care for him, as they have in the past. They love him and they want to be with him as he nears the end of his life.

If imprisoned in the BOP, Mr. Payne will not receive the medical care he needs. He certainly will not have access to specially trained LVAD physicians, likely shortening his already truncated life expectancy. Indeed, in as early as 2000, the Government Accountability Office ("GAO") raised alarms that ballooning incarceration rates and long sentences produce a large, older inmate population, resulting in problems in delivery of medical care for all inmates.[6] A recent Inspector General report revealed that the BOP struggles to hire and retain healthcare professionals. Only 80% of authorized medical positions are filled across BOP—this is true even at the Federal

---

[6] Brief of Amici Curiae Former Corrections Officials, *Rutherford v. United States and Johnnie Markel v. United States*, Nos. 24-820, 24-860 (U.S. August 14, 2025) *citing Containing Health Care Costs for an Increasing Inmate Population, Testimony before the Subcomm. on Criminal Justice Oversight*, 106th Cong. 6 (Apr. 6, 2000) (statement of Richard Mr. Stana, Assoc. Dir.)

Medical Centers.[7] For example, FMC Devens has a 76% medical staffing rate.[8] Moreover, the transport from the D.C. Jail to BOP is notoriously lengthy and treacherous. During transport, Mr. Payne may not have access to any doctors should an emergency occur.

Setting aside the medical needs that Mr. Payne has, correctional staff will not care for him with the tender love and experience of a family member. Under these circumstances, home incarceration is not only more efficient and cost-effective, but it is abundantly more humane. Mr. Payne's BMD, related heart failure, chronic pain, limited mobility, and limited life expectancy are "extraordinary" physical impairments that both independently and collectively merit at least a 6-level downward departure. *See e.g. United States v. Velasquez*, 762 F. Supp. 390 (EDNY 1991) (metastasized cancer was serious life-threatening illness which constituted ground for departure under 5H1.4); *see also United States v. Ghannam*, 899 F.2d 327, 329 (4th Cir.) (noting that "Section 5H1.4 allows downward departures any time a sentencing court is presented with sufficient evidence of impairment").

### ii. **Mr. Payne should receive a 2-level reduction because he accepted responsibility**.

The PSR erroneously withholds a two-level reduction for acceptance of responsibility under USSG § 3E1.1(a) notwithstanding the fact that two months before trial and before filing pre-trial motions, Mr. Payne pleaded guilty to the one-count Indictment without reservation.

The Commentary to the Guideline set forth considerations that the Court may consider in determining whether a defendant qualifies for the two-level reduction under subsection (a):

---

[7] *Id.* citing *Oversight of the Federal Bureau of Prisons: Hearing Before the Subcomm. on Crime & Fed. Gov't Surveillance of the H. Comm. on the Judiciary*, 118th Cong. 5 (July 24, 2024) (statement of Collett S. Peters, Dir. BOP); OIG, Evaluation of Issues Surrounding Inmate Deaths in Federal Bureau of Prison Institutions 64-67 (2024).

[8] *Id.* OIG, *Inspection of the Federal Bureau of Prisons' Federal Medical Center Devens* 10-11(2024).

7

In determining whether a defendant qualifies under subsection (a), appropriate considerations include, but are not limited to, the following:

> (A) truthfully admitting the conduct comprising the offense(s) of conviction, and truthfully admitting or not falsely denying any additional relevant conduct for which the defendant is accountable under §1B1.3 (Relevant Conduct). Note that a defendant is not required to volunteer, or affirmatively admit, relevant conduct beyond the offense of conviction in order to obtain a reduction under subsection (a). A defendant may remain silent in respect to relevant conduct beyond the offense of conviction without affecting his ability to obtain a reduction under this subsection. A defendant who falsely denies, or frivolously contests, relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility, but the fact that a defendant's challenge is unsuccessful does not necessarily establish that it was either a false denial or frivolous;
> (B) voluntary termination or withdrawal from criminal conduct or associations;
> (C) voluntary payment of restitution prior to adjudication of guilt;
> (D) voluntary surrender to authorities promptly after commission of the offense;
> (E) voluntary assistance to authorities in the recovery of the fruits and instrumentalities of the offense;
> (F) voluntary resignation from the office or position held during the commission of the offense;
> (G) post-offense rehabilitative efforts (*e.g.*, counseling or drug treatment); and
> (H) the timeliness of the defendant's conduct in manifesting the acceptance of responsibility. 3E1.1, App. Note 1.

The Commentary goes on to state in pertinent part:

> Entry of a plea of guilty prior to the commencement of trial combined with truthfully admitting conduct comprising the offense of conviction, and truthfully admitting or not falsely denying any additional relevant conduct for which he is accountable under 1B1.3 (Relevant Conduct). . . will constitute significant evidence of acceptance of responsibility for the purposes of subsection (a).

Prior to trial, Mr. Payne admitted that he possessed a firearm on January 8, 2025. He did not deny any relevant conduct. By pleading guilty more than two months before trial and before the adjudication of pre-trial motions, he saved the Court time and resources. His acceptance of responsibility should be accounted for in his guideline range.

The PSR bases its denial of a two-level reduction on Mr. Payne's alleged possession of contraband while he was in the cellblock. First, the contraband (small vials of scented oils, a small

8

pocket-knife, and his prescribed pain medication crushed in a plastic bag) does not undermine his acceptance of responsibility for a completely unrelated offense, nor does it rise to the level of continuing criminal conduct. Even if the Court were to find that Mr. Payne's alleged possession of contraband constitutes "criminal conduct," withdrawal from criminal conduct is only one factor the Court may weigh in determining whether he should receive credit for accepting responsibility. The other factors—including his acceptance of responsibility months before trial and before pre-trial motions—weigh in favor of granting a 2-level reduction under § 3E1.1(a).

### iii. The guidelines crudely account for magazine size and inflate the guideline range.

While counsel does not dispute that the base offense level is 20 under USSG § 2K2.1(a)(4)(B) because the offense involved a "semiautomatic firearm capable of accepting a large capacity magazine" as defined by the guidelines, the magazine in this case held 16 rounds—therefore it just meets the threshold of "more than 15 rounds" required to trigger the elevated base offense level.[9] In this case, the firearm that Mr. Payne possessed had the manufacturer's magazine that came with the firearm. There is no evidence that he (or anyone else) replaced the firearm manufacturer's 16-round magazine to include more rounds. And yet, the presence of the 16-round magazine (in effect, *one* round) nearly doubles his guideline range. Specifically, because Mr. Payne possessed a firearm equipped with a magazine that could hold 16 rounds—one above the threshold—his base offense level increased from the standard 14 for a prohibited person to a base offense level of 20. This six-level increase is the product of the minor difference of one round and has an overwhelming impact on Mr. Payne's guideline range. Assuming all else were equal, if the magazine was capable of accepting just one fewer round, Mr. Payne's guideline range would be

---

[9] USSG 2K2.1 cmt 2 defines "semiautomatic firearm that is capable of accepting a large capacity magazine" as a firearm that has a magazine that can accept "more than 15 rounds of ammunition."

27 to 33 months, down from 51 to 63 months. The near doubling of the guideline range is especially arbitrary because there is no evidence that Mr. Payne removed the magazine that fit the firearm to replace it with a larger capacity magazine. The overbreadth of § 2K2.1(a)(4)(B) is even more clear when considering that a 50-round magazine is treated exactly the same as a 16-round magazine. The identical treatment of these two magazines reflects the guidelines failing to consider the additional steps an individual would have to take to procure a much larger magazine.

    iv.    **After reductions, the adjusted offense level should be 6**.

The defense respectfully urges the Court to vary down six levels because the offense level is inflated due to the presence of one round in a gun that was not even operable. This would bring the offense level to 14. The Court should then grant a 6-level downward departure under USSG § 5H1.4 and a 2-level reduction for Mr. Payne's complete and timely acceptance of responsibility, resulting in a total Offense Level of 6. Mr. Payne is in criminal history category IV; therefore, the applicable guideline range is 6 to 12 months. Offense level 6, criminal history category IV, is in Zone A of the Guidelines' table. Under USSG § 5C1.1, a sentence of imprisonment is therefore not required.

    III.    **The § 3553(a) sentencing factors support a sentence of time served.**

    i.    **Mr. Payne's history and characteristics and the nature and circumstances of the offense support a sentence of time served.**

Jamal Payne is 31 years old. He was born in Washington, D.C. and raised by a single mother. He never had a relationship with his father, who passed away when he was five years old. In many ways, Jamal's life has been shaped by BMD, a genetic disease which took the lives of his four maternal uncles before they turned 30. Employed as a bus driver, Jamal's mother did not have many resources, but she did her best to give Jamal a "normal" childhood. Jamal attended school and played in the neighborhood with the other children, but his childhood was beset with chronic

fatigue, shortness of breath, and aching muscles. By the age of 7, climbing stairs and running were hard for Jamal. His legs tired quickly and he fell often. Not understanding why he could not keep pace, other kids teased him. As he lost physical strength, Jamal felt increasingly vulnerable to the dangers present in his violence-plagued, underserved neighborhood. Over time, Jamal developed a defensive attitude—lashing out and yelling as a way of pushing people away and protecting himself. To outsiders—especially people without medical training such as correctional officers—Jamal's confrontational tone can be jarring and upsetting. By his late teens, Jamal could no longer walk and eventually needed a wheelchair most of time. While his body was giving out, his heart was also failing. In 2014, he had surgery to have a left ventricular device (LVAD) installed in his heart. The LVAD essentially pumps blood through the body because his heart can no longer do so. When prominent cardiologist Dr. Sheikh performed the surgery, the expectation was that it would extend Jamal's life by about five years. The LVAD surgery exceeded expectations and kept Jamal alive much longer than Dr. Sheikh predicted and for that, Jamal and his mother are grateful. Due to the LVAD device, Jamal has experienced the joy of a committed relationship with his partner, Ebony, and the joy of having children. Jamal and Ebony's children live with Ebony and before he was incarcerated, Jamal's children visited him often. He is a doting and loving father. He shares a close relationship with his mother, his sister, and Ebony. Together, these women are the anchors of his life. They want to care for him as his disease continues to progress and be there for him when it eventually, inevitably, takes his life.

### *Nature and circumstances of the offense*

The nature and circumstances of Mr. Payne's offense are straightforward and uncontested. On January 8, 2025, Mr. Payne was rushed to the hospital due to severe chest pains. After he was admitted, a nurse discovered a firearm in his backpack. In his rush to go to the hospital, Mr. Payne

11

had forgotten to remove the firearm. He had no intention of using it. It was inoperable until law enforcement cleaned it in order to test fire it. Mr. Payne can no longer move quickly or even get up from his wheelchair. Feeling like a sitting a duck and aware of the gun violence around him, Mr. Payne had earlier obtained a firearm for self-defense purposes only. He realizes now that having a gun around causes him nothing but hardship.

> ii. **A sentence of time-served under these circumstances is more than sufficient to achieve the basic aims of sentencing**.

Mr. Payne's case is unique among other firearms cases before the Court because of his terminal illness. Simply put, he is far from the average defendant. And because of that, his alleged violations and conduct must be viewed through a different lens—one that takes into account his physical frailty and the disease that has so profoundly shaped his life since he was a little boy.

With respect to specific deterrence, Mr. Payne knows that if he possesses a firearm again, he will most likely die in prison if he does not pass away serving this Court's sentence. He does not want that for himself or his mother and sister. With respect to just punishment, conditions at the jail have been particularly brutal this summer and fall. There have been several stabbings and one murder since Jamal has been detained. He has been accosted and threatened for his commissary. It has been hot, overcrowded, and uncomfortable for all inmates, but particularly for Mr. Payne. While the Court found that the jail is able to meet his medical needs, that is a separate question from how painful and punishing the jail is for a man in Mr. Payne's condition. The jail for Mr. Payne is far more punishing than it is for a healthy 31-year-old. Severe pre-trial detention conditions are an appropriate basis to reduce a defendant's sentence. *See United States v. Jayyousi*, 657 F.3d 1085, 1118 (11th Cir. 2011) (a court "may reduce a sentence to account for the harsh conditions of pretrial confinement"); *United States v. Carty*, 264 F.3d 191, 196 (2d Cir. 2001) (per curiam) (same).

Mr. Payne is an extremely sick individual. His bravado and sometimes belligerent demeanor should not be mistaken for dangerousness or violence. Nor should his obstreperous demeanor obscure the fact that he is getting weaker, his heart is failing, and he will die from BMD within the next five years. Mr. Payne should not be condemned to die alone in a cell far away from the embrace of the three women who have loved him through it all.

Time-served followed by home incarceration is not only the appropriate sentence in this case, but it is a just and humane sentence that will fairly take into account Mr. Payne's non-violent offense conduct and his terminal, debilitating illness.

A. J. KRAMER
FEDERAL PUBLIC DEFENDER

/s/
_____
ELIZABETH MULLIN
Assistant Federal Public Defender
625 Indiana Avenue, N.W., Suite 550
Washington, D.C.  20004
(202) 208-7500